IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASKAN HOLDINGS, ) <br> ) <br>     Plaintiff, ) <br> ) <br>     *v.* ) <br> ) <br> U.S. DEPARTMENT OF THE TREASURY, ) <br> OFFICE OF FOREIGN ASSETS CONTROL; ) <br> STEVEN MNUCHIN, in his official capacity as ) <br> Secretary of the U.S. Department of the ) <br> Treasury; and ANDREA GACKI, in her official ) <br> capacity as Director of the U.S. Department of ) <br> the Treasury, Office of Foreign Assets Control; ) <br> ) <br>     Defendants. | Civil Action No. 1:20-cv-1458 (RJL) |

**DECLARATION OF ANDREA M. GACKI**

I, Andrea M. Gacki, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am the Director of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"). I assumed this position on September 17, 2018, after having previously served as Acting Director from May 2018 through September 17, 2018; as Deputy Director from March 2017 to May 2018; and as Acting Deputy Director from February 2015 to March 2017. I previously served as OFAC's Associate Director for Compliance and Enforcement from 2014 until March 2017 (which is a position I held while concurrently serving as Acting Deputy Director) and as OFAC's Assistant Director for Licensing from 2010 to 2014. In 2014, I was selected to the Senior Executive Service. I first joined OFAC in March 2008 as the Senior Sanctions Advisor for Program Policy & Implementation.

2. As Director, I am responsible for, among other things, leading the development, operational implementation, and enforcement of economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign governments, individuals, and

1

entities.  I am also responsible for representing U.S. Department of the Treasury positions in the U.S. interagency and international environments.  As Director of OFAC, I report to the Deputy Secretary of the U.S. Department of the Treasury, Justin Muzinich, who is currently also acting as the U.S. Department of the Treasury's Under Secretary for Terrorism and Financial Intelligence.

3. In connection with my responsibilities as Director, I am generally familiar with the Complaint filed by Plaintiff, Askan Holdings Ltd. ("Plaintiff"), and I am familiar with the issues presented in this case.  I make this declaration in support of Defendants' opposition to Plaintiff's motion for a preliminary injunction, and the declaration is based on my personal knowledge or information available to me in the course of performing my official duties.

## OFAC's Mission and Authority

4. OFAC is the office principally responsible for administering U.S. economic sanctions programs.  These programs are primarily directed against foreign states and nationals, including sponsors of global terrorism, foreign narcotics traffickers, and weapons of mass destruction proliferators, to implement U.S. foreign policy and national security goals.  Pursuant to authority delegated by the President to the Secretary of the Treasury, OFAC acts under Presidential wartime and peacetime national emergency powers as well as authority granted by specific legislation to impose controls on transactions and to freeze, or "block," certain property and interests in property that are in the United States, that come within the United States, or that are or come within the possession or control of a U.S. person.

5. In performing its function, OFAC relies primarily on its broad delegated powers under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706.  IEEPA grants the President a broad spectrum of powers to deal "with any unusual and

extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).  Pursuant to IEEPA, the President may, among other actions, "nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer . . . or dealing in, or exercising any right, power, or privilege with respect to, or any transaction involving, any property in which any foreign country or national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B).  The President typically exercises these IEEPA powers through Executive orders that declare a national emergency and impose economic sanctions to address the emergency.

6. Section 5 of the United Nations Participation Act ("UNPA"), 22 U.S.C. § 287c, grants the President the authority to apply certain measures that the United States has been called upon to apply by the United Nations Security Council.  This authority includes the power to "investigate, regulate, or prohibit, in whole or in part, economic relations . . . involving property subject to the jurisdiction of the United States." 22 U.S.C. § 287c(a).  As with IEEPA, the President typically exercises his UNPA powers through Executive orders.  Often, a single Executive order will be based on authority derived from IEEPA and the UNPA, as well as other sources.

7. OFAC currently administers over 30 economic sanctions programs against foreign governments, other entities, and individuals whose activities are contrary to U.S. national security and foreign policy interests.  For example, OFAC administers sanctions programs relating to particular countries, such as Ukraine, Iran, Cuba, Syria, North Korea, and Venezuela.

OFAC also implements sanctions programs pertaining to particular activities like narcotics trafficking, terrorism, and the proliferation of weapons of mass destruction.

8. As Director of OFAC, I am responsible for the implementation, administration, and enforcement of such economic sanctions programs.

### **OFAC's Blocking Programs**

9. IEEPA Executive Orders and specific sanctions legislation often authorize or require the blocking of the property and interests in property that are within the United States or within the possession or control of U.S. persons, wherever located, of persons who have been determined to meet certain criteria set forth in the relevant authority. The names and identifying information of such persons are listed on OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List"). These Executive Orders and statutes require holders of such property, including banks, to freeze that property within their possession or control at the time of the blocking, as well as any such property that later comes within their possession or control. Blocking actions are not permanent and do not constitute a forfeiture or seizure of assets. Rather, they are temporary measures intended to change behavior. When the President determines that a national emergency has concluded, all assets blocked because of that emergency are generally unblocked. Similarly, if the sanctions imposed on a designated person are lifted, their assets are unblocked.

10. OFAC broadly defines the terms "property" and "interests in property." The Global Terrorism Sanctions Regulations ("GTSR"), 31 C.F.R, Part 594, issued pursuant to the President's delegated IEEPA authority, define these terms to include, among others, bank deposits, savings accounts, contracts, book accounts, letters of credit, services of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or

4

interests therein, present, future, or contingent. 31 C.F.R. § 594.309. Under the GTSR, the term "interest" is broadly defined to include a property interest "of any nature whatsoever, direct or indirect." 31 C.F.R. § 594.306. A minor, future, or subordinate property interest of a sanctions target, therefore, can trigger a blocking, even where a non-sanctioned party has a superior ownership interest in the property. Because of the broad definitions of property and interests in property, OFAC regulations require the blocking of assets beyond what the sanctions target actually owns.

11. The prohibition against dealing in property and interests in property of a sanctions target can serve many important objectives. Broadly, blocking makes it difficult for the sanctions target to conduct business both with the United States and with foreign countries. It prevents the sanctioned entity from receiving the economic benefits of transactions with U.S. persons or in the U.S. market, and it limits the flow of hard currency, goods, and other property to or for the benefit of that sanctions target, preventing the sanctions target from using it to further ends that conflict with U.S. interests. The frequent use of the U.S. dollar in international commerce, and the fact that dollar-denominated transactions generally pass through a U.S. bank, magnify the effectiveness of a blocking program. Blocking disrupts commercial transactions with sanctions targets that in any way touch the United States or U.S. persons, isolating the sanctions targets in the global marketplace, and raising their costs of engaging in international transactions. That isolation and those increased costs also discourage third-country business with sanctions targets. Particularly relevant here, blocking property of designated terrorists and their supporters prevents its possible use in the orchestration, assistance, or support of unlawful and dangerous global terrorist plots.

12. Implementing IEEPA Executive orders broadly results in the greatest possible sanctions impact. By blocking all property interests of sanctions targets, and not merely property owned by sanctions targets, OFAC maximizes its disruption of threats to national security and foreign policy, minimizes opportunities to evade sanctions through, for example, the use of front companies, and increases the Administration's leverage in dealing with such threats.

### U.S. Government Strategy vis-à-vis Terrorist Financing

13. Since September 11, 2001, the U.S. Government has launched an intensive campaign to track and target terrorist financing, drawing on a wide range of agencies, authorities, and resources. In the appropriate circumstances, the U.S. Government draws upon a range of tools to disrupt terrorist financing channels and networks, including diplomatic action, sanctions, law enforcement, and covert activities. Past efforts have yielded concrete gains, straining terrorist organizations, forcing covert cells to adopt riskier methodologies, and, in some instances, rendering terrorists unable to proceed with deadly attack plans. Terrorist groups raise, move, and store their monies using a range of opaque and sometimes complex techniques and methods. A key component of U.S. efforts to combat terrorism financing is Executive Order 13224 of September 23, 2001 ("E.O. 13224").

14. After the September 11, 2001 attacks at the New York World Trade Center, in Pennsylvania, and against the Pentagon, President Bush issued E.O. 13224.[1] E.O. 13224 begins with the President's declaration that the threat of terrorist attacks constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States:

> I, George W. Bush, President of the United States of America, find that grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and the Pentagon committed on September 11, 2001 . . . and the continuing and immediate threat of further attacks

---

[1] E.O. 13224, "Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism," 66 Fed. Reg. 49079 (Sept. 25, 2001).

> on United States nationals or the United States constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and . . . hereby declare a national emergency to deal with that threat. I also find that because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists.

E. O. 13224.

15. E.O. 13224 blocks all property and interests in property within the United States or in the possession or control of U.S. persons, including foreign branches, in which any person listed in the Annex to the order or subsequently determined to be subject to the order has an interest. The GTSR incorporates the sanctions criteria and prohibitions from E.O. 13224, and the term used to denote those persons blocked under these authorities is "Specially Designated Global Terrorist" ("SDGT").

16. On September 9, 2019, the President issued Executive Order 13886, "Modernizing Sanctions To Combat Terrorism" ("E.O. 13886").[2] To further strengthen and consolidate sanctions to combat the continuing threat posed by international terrorism, and in order to take additional steps to deal with the national emergency declared in E.O. 13224, E.O. 13886 amended E.O. 13224. OFAC's actions related to the property at issue in this case were taken pursuant to E.O. 13224 prior to its amendment in 2019 and the GTSR.

## OFAC Licensing Authority

17. Once property in which a SDGT has an interest, such as a wire transfer, is blocked by a U.S. person, the GTSR do not allow the parties to the transaction or third parties to extinguish the SDGT's interest in the blocked property. If this were not the case — *i.e.*, if parties to a blocked transaction could extinguish a sanctions target's interest in blocking property by

---

[2] E.O. 13886, "Modernizing Sanctions To Combat Terrorism," 84 Fed. Reg. 48041 (Sept. 9, 2019).

7

paying the sanctions target through other means — then the authority to block wire transfers would in practice be reduced to the authority merely to delay wire transfers. A foreign company could find an alternative means to make payment to the sanctions target and regain the blocked funds from the blocking bank, resulting in only a minor inconvenience to it and to the sanctions target as a result of the "blocking" program. Sanctions would lose their effectiveness: there would be far less disruption of international transactions with sanctions targets, and the President's ability to address the national emergencies declared under IEEPA would thus be limited. The policy imperative that a sanctions target's interest in blocked property not be extinguished absent OFAC authorization has long been codified in OFAC's regulations. *See, e.g.*, 31 C.F.R. § 594.404(b).

18. However, under its sanctions programs, OFAC may issue licenses to authorize otherwise prohibited transactions. Specifically, the GTSR allow OFAC to issue a license that provides a means by which the property in which a SGDT has an interest would be deemed no longer blocked. *See* 31 C.F.R. § 594.404. Licenses are either "general" or "specific." General licenses may be published in the regulations, on OFAC's website, or both. A specific license may be issued when a person requests authorization to conduct an otherwise prohibited transaction or service. *See* 31 C.F.R. § 501.801(b).

19. The regulations administered by OFAC generally do not compel the issuance of specific licenses once certain criteria are met. Rather, OFAC's blocking authority under IEEPA and implementing Executive Orders grants the agency the discretion to issue or withhold specific licenses based on national security and foreign policy considerations. OFAC issues specific licenses in a manner consistent with the national security and foreign policy objectives of the United States. Because the national security and foreign policy calculus is complex, subtle, and

ever-changing, OFAC must consider all applications for specific licenses on a case-by-case basis in light of all relevant facts and circumstances. This case-by-case consideration takes into account the facts that no two sanctions programs present the same set of national security and foreign policy concerns, that those concerns can change, and that applicants frequently present novel circumstances and requests.

20. OFAC's policy contemplates that property and interests in property blocked because a sanctioned person has an interest in the property generally should remain blocked until the person with an interest in the property is no longer designated and included on the SDN List, or the national emergency underpinning the blocking is terminated. Accordingly, it is OFAC's policy to license the release of blocked property only in limited circumstances, most of which do not involve commercial activity. In general, OFAC licenses the release of property that has been improperly blocked and may issue licenses to unblock property where such requests relate to transactions that fall within OFAC's statements of licensing policy, as found in OFAC regulations or on the OFAC website, or to support the foreign policy goals of the United States. For example, international organizations, such as the United Nations ("UN") will sometimes have payments related to humanitarian activities properly blocked, often due to the routing of the payments through designated banks. In cases such as these, the UN will apply to OFAC for a license, and after consultation with U.S government interagency partners, OFAC may decide to release the funds back to the UN.

## License Application History

22. OFAC received a request from Askan Holdings, Ltd. ("Askan Holdings") to license the release of the blocked funds at issue in this case on May 18, 2016.[3] Based on the

---

[3] Another entity, Froriep, also sought a license for these funds on February 22, 2016. OFAC denied that request on the same basis on May 2, 2017. It is my understanding that Froriep is not a Plaintiff in the instant lawsuit.

information in the application and information otherwise available to OFAC, the agency determined that a person blocked pursuant to the GTSR had an interest in the blocked funds in question. OFAC determined that the license request did not fall within the limited categories of circumstances in which OFAC would consider releasing blocked funds. Accordingly, OFAC determined that licensing the release of the blocked funds in this case would be inconsistent with OFAC policy, and OFAC denied the request on May 2, 2017.

23. OFAC received a second license application from Askan Holdings on October 9, 2019, requesting a reconsideration of OFAC's 2017 decision not to license the release of the blocked funds. OFAC reviewed the information submitted and determined once again that a person blocked pursuant to the GTSR had an interest in the funds and that licensing the release of the blocked funds would be inconsistent with OFAC policy. Therefore, OFAC denied that request on June 12, 2020.

## Process of Creating an Administrative Record

24. When a litigant initiates a lawsuit challenging one or more final agency actions pursuant to the Administrative Procedure Act, OFAC begins to compile the administrative record ("AR"). The AR must be assembled from all of the records considered, directly or indirectly, by the decision-maker when reaching the final agency decision being challenged in the lawsuit.

25. Compiling an AR is a complex process involving multiple steps to ensure the record is complete, national security interests are protected, and equity holders have the opportunity to review for privilege claims. Often, as in this case, materials from several OFAC components and other offices within the Department of the Treasury must be assembled, organized, and reviewed for privilege and other disclosure restrictions. Some of these materials may be in hard copy in OFAC's records, requiring a physical review to obtain the relevant

records.  Further, if OFAC received any documents from other agencies or private third parties, OFAC must consult the equity holders to ensure national security and law enforcements interests are adequately protected, and to provide them the opportunity and sufficient time to claim privilege, as appropriate.  For example, a financial institution that has provided information to OFAC may want to assert that the documentation contains trade secrets or business confidential information that should be withheld.  Similarly, a government agency may need to withhold law enforcement sensitive information.  The assembly of the administrative record can be further complicated if OFAC considered classified information in the course of making its final agency decision as this process adds another layer of review and consultation to ensure the protection of national security equities.  Such work can only be performed at a facility designed to accommodate classified information.

### Exigent Circumstances Related to Pandemic and Protests

27.     The limitations placed on the government workforce in the current environment compound the complex process discussed above.

28.     First, in light of the pandemic, OFAC is operating under highly constrained conditions.  On March 11, 2020, the World Health Organization publicly characterized COVID-19 as a pandemic.[4]  On March 13, 2020, the President declared a National Emergency in an effort to address the spread of COVID-19.[5]  The Office of Personnel Management ("OPM") has been issuing guidance concerning the continuity of Federal Government operations, including

---

[4] *See* National Public Radio, "Coronavirus: COVID-19 Is Now Officially A Pandemic, WHO Says," https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a-pandemic-who-says (last accessed June 19, 2020).
[5] *See* The White House, "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak," https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last accessed June 19, 2020).

recommendations that agencies permit employees to telework.[6]  The Office of Management and Budget ("OMB") has asked agencies to "offer maximum telework flexibilities to all current telework eligible employees, consistent with the operational needs of the departments and agencies as determined by their heads."[7]

29.     Since March 15, 2020, Treasury's Departmental Offices (which includes OFAC) has maintained a posture of either *maximum* or *mandatory* telework.  Although as of June 15, 2020 Treasury has transitioned to phase 1 of its reopening plan, it remains in a *maximum* telework posture and the vast majority of its staff are directed to telework five days a week.  OFAC divisions requiring access to classified systems, or that have a need to be physically present in the building to carry out mission-essential duties, will come into the office more frequently than in a *mandatory* telework posture, but on a staggered, rotating basis.  During phase 1 of the reopening plan, OFAC aims to have no more than 20 percent of its overall workforce in the office on any particular day to ensure safe social distancing practices are maintained.  Despite OFAC's diligent efforts to locate and compile the AR, which OFAC has deemed a mission-essential duty, this limited staffing posture has complicated and delayed the compilation of the AR in this case.

30.     In addition, protest-related security measures have complicated OFAC's ability to access its hard copy records.  On May 29, 2020, protestors demonstrated at the Treasury complex

---

[6] *See* United States Office of Personnel Management, "Memorandum for: Heads of Executive Departments and Agencies. Subject: Coronavirus Disease 2019 (COVID-19); Additional Guidance" (Mar. 7, 2020), available at https://www.chcoc.gov/content/coronavirus-disease-2019-covid-19-additional-guidance (last accessed June 19, 2020).

[7] *See* Memorandum from the Acting Director of The Office of Management and Budget to the Heads of Departments and Agencies "Updated Guidance for National Capital Region on Telework Flexibilities in Response to Coronavirus" (Mar. 15, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/M20-15-Telework-Guidance-OMB.pdf (last accessed June 19, 2020).

and the Freedman's Bank Building, where OFAC is located,[8,9] and in the weeks that followed, protests regularly took place in the area around the Treasury complex, which is located near the White House.[10,11]  This led to a heightened security posture at the Treasury complex, mandatory early departures from the complex for anyone working there, and requests for OFAC employees who must do work in the office to do so from alternate Treasury building locations, which are separate and apart from where OFAC's hard copy files, including any hard copy files pertinent to this case, are maintained.  At the time that OFAC was notified of this lawsuit, nearly all employees were teleworking as a result of the pandemic or working at alternate locations in response to the heightened security posture and unable to access OFAC's hard copy files, creating additional unusual complications for compiling an AR.  This heightened security posture was relaxed on June 8, but protests continued, and OFAC employees whose duties required them to be in the office were still encouraged to work from alternate locations for several additional days.

31. Despite these circumstances, OFAC is working diligently and expeditiously to compile the AR at this time.

---

[8] *See* WAMU, "Demonstrators in D.C. Gather To Protest Death of George Floyd," https://wamu.org/story/20/05/29/crowd-swells-at-14th-u-in-protest-of-george-floyd-killing/ (last accessed June 19, 2020).
[9] *See* The Washington Post, "Demonstrations for George Floyd lead to clashes outside White House," https://www.washingtonpost.com/local/public-safety/demonstration-for-george-floyd-shuts-down-dc-intersection/2020/05/29/af7b5d40-a1f9-11ea-b5c9-570a91917d8d_story.html (last accessed June 19, 2020).
[10] *See* The Washington Post, "Protesters' breach of temporary fences near White House complex prompted Secret Service to move Trump to secure bunker," https://www.washingtonpost.com/politics/secret-service-moved-trump-to-secure-bunker-friday-after-protesters-breached-temporary-fences-near-white-house-complex/2020/06/03/e4ae77c2-a5b9-11ea-b619-3f9133bbb482_story.html (last accessed June 19, 2020).
[11] *See* NBC4 Washington, "Photos: Thousands of Protesters Gathered for Saturday Demonstrations in DC," https://www.nbcwashington.com/news/local/photos-protesters-gather-for-the-largest-expected-demonstration-in-dc/2324872/ (last accessed June 19, 2020).

## Conclusion

31. I certify, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct.

        Executed on this 19th day of June 2020.

        Andrea Gacki  
        Director  
        Office of Foreign Assets Control  
        U.S. Department of the Treasury  
        1500 Pennsylvania Avenue, N.W.  
        Freedman's Bank Building  
        Washington, D.C. 20220